Anthony MORANGELLI et al., Plaintiffs,

v.

**CHEMED CORPORATION
et al., Defendants.**

**No. 10 Civ. 0876(BMC).**

United States District Court,
E.D. New York.

June 16, 2011.

Decision Granting Motion
for Reconsideration
July 8, 2011.

Michael J.D. Sweeney, Getman & Sweeney, PLLC, Brent E. Pelton, Pelton & Associates, PC, for Plaintiffs.

Robert Neil Holtzman, Kerri Ann Law, Jared Ian Heller, Kramer, Levin, Naftalis & Frankel, LLP, for Defendants.

## *MEMORANDUM DECISION AND ORDER*

COGAN, District Judge.

Before me are plaintiffs' motions to certify a nationwide class on three separate claims and to include seven plaintiffs who have not yet opted in to the FLSA collective action. The motion to certify the class is granted in part, with the class action certified on the question of liability only. The motion to allow two of the seven plaintiffs to join the collective action is granted on consent. I reserve decision on whether to allow the remaining five individuals to join the action until they submit affidavits for further review.

## *BACKGROUND*

Although familiarity with the background and prior rulings in this wage and hour action is presumed, facts that pertain to the two pending motions merit some attention. Plaintiffs and the putative class they seek to represent are service technicians who provide drain cleaning and plumbing services to defendants' residential and commercial customers. Defendants have 50 branches and employ over 1,600 technicians nationwide. Plaintiffs seek certification for technicians working at 34 of these branches, located in 14 states: New York, New Jersey, California, Colorado, Connecticut, Florida, Hawaii, Illinois, Indiana, Minnesota, Missouri, North Carolina, Ohio, and Washington. The proposed class includes only those technicians working on commission and not the hourly-paid technicians that defendants also employ.

Plaintiffs allege that defendants violated the Fair Labor Standards Act (FLSA) and minimum wage and overtime law in the 14 states where the technicians worked. Specifically, plaintiffs allege that defendants violated both sets of laws when they: (1) imposed business expenses on plaintiffs "that had the effect of bringing their wages below" the FLSA and state minimum wages; and (2) failed to compensate plaintiffs for "all hours of work, including but not limited to, time shaved from their actual hours of work, time spent at turn-in and other meetings, and time spent maintaining their vans and work equipment."

Plaintiffs have labeled the first theory of liability, the "business expense claim" and the second, the "uncompensated hours claim." I authorized plaintiffs' counsel to send notices to potential plaintiffs of their right to opt into the FLSA collective action based on the two claims; more than 400 plaintiffs have done so.[1] Seven plaintiffs, Lopez, Megeed, Alvarado, Bryner, Molina, Somerson, and Villatoro seek to opt in although the court-imposed deadline has passed. Defendants contend that Lopez, Megeed, Alvarado, Bryner, and Somerson have not offered good cause to allow them to

---

1. Courts, including this one and the Second Circuit, *see e.g., Kuebel v. Black & Decker Inc.,* 643 F.3d 352, 357 (2d Cir.2011), have called this stage of the FLSA proceeding, "conditional certification." This is a misnomer and may obfuscate the leniency of the standard employed to authorize plaintiffs' counsel to send notices of the action. When the Court allows notices to be sent out, it is only making a preliminary determination—often based solely on allegations—of whether plaintiffs are "similarly situated" under, 8 U.S.C. § 216. *See* C. Wright, A. Miller & E. Cooper, 17A *Federal Practice and Procedure* 3d § 1807 (2011). The Court is not assuming that a class exists as Rule 23 used to permit courts to do, *see* 1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 3:6 (6th ed. 2010) (explaining the history of "conditional certification" of class actions); there is no class in a collective action. Nor is the Court certifying anything—class or otherwise.

participate in this lawsuit, but consent to allowing Molina and Villatoro to join.

Finally, plaintiffs also allege that defendants have violated the state laws by "taking deductions from the plaintiffs' wages," calling this the "illegal deductions claim." Plaintiffs from most of the states move for class certification for all three claims under the applicable state laws.[2] In support of their motion, they argue that all the putative class members "held identical jobs and performed similar, if not identical, job duties." They were also "subject to the same nationwide pay and record-keeping policies and ... recorded their work time in the same way." Defendants contend that their policies and practices vary by state and even by branches within each state. The arguments presented by both sides as they pertain to each of plaintiffs' claims are set out in detail below.

### DISCUSSION

### I. Standard for Class Certification

▮ Rule 23(a) of the Federal Rules of Civil Procedure requires that any proposed class action be "(1) be sufficiently numerous, (2) involve questions of law or fact common to the class, (3) involve class plaintiffs whose claims are typical of those of the class, and (4) involve a class representative or representatives who adequately represent the interests of the class." *Myers v. Hertz Corp.,* 624 F.3d 537, 547 (2d Cir.2010). Two points not obvious from the face of the Rule are also worth mentioning. First, the party moving for class certification "bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met" *Id.* at 547. Second, the commonality requirement (the second element) is distinct from the typicality requirement (the third element) even if the analyses tend to merge, *see Marisol A. by Forbes v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997); the former "tests the definition of the class itself" while the latter "focuses on how the named plaintiff's claims compare to the claims of other class members." 5 *James W. Moore et al.,* Moore's Federal Practice § 23[6].

In addition to satisfying Rule 23(a)—a prerequisite to class certification—plaintiffs must show that the action is maintainable as a class by meeting one of the subdivisions of Rule 23(b). Plaintiffs seek class certification under Rule 23(b)(3) and must therefore also show that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) that a "class action is superior to other available methods" for adjudicating the controversy. Fed.R.Civ.P. 23(b)(3).

As the Advisory Committee explains, Rule 23(b)(3) is meant to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated...." The Supreme Court has recognized that while it is not explicitly expressed within the Rule, the goal is to provide "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (citation and quotation marks omitted).

▮ The "Second Circuit has emphasized that Rule 23 should be 'given liberal rather than restrictive construction'" and has shown a "preference for granting rather than denying class certification." *Gortat v. Capala Bros.,* 257 F.R.D. 353, 361 (E.D.N.Y. 2009) (quoting *Marisol A. v. Giuliani,* 126 F.3d 372, 377 (2d Cir.1997)). Nevertheless, plaintiffs must still establish that they have met all the Rule 23 requirements and the Court must perform a "rigorous analysis" before certifying the class. *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). In doing so, the Court must resolve the relevant factual disputes, even if they overlap with issues that go to the merits of the case. *See In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24, 41–42 (2d Cir.2006); *see also* 1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 5:23 (6th ed. 2010) ("The predominance inquiry (like the commonality

---

**2.** Plaintiffs from Florida and Hawaii seek certification of the business expenses and uncompensated hours claims only, and plaintiff from North Carolina moves for certification on the illegal deductions claim only.

inquiry) is closely linked to the merits of the plaintiffs' claim, because the nature of the evidence needed to resolve a factual or legal question determines whether any particular question is common or individual.").

## II. Plaintiffs' claims for certification

Before applying Rule 23, it is important to note that plaintiffs move for certification of a class that would contain 14 subclasses, reflecting the 14 different state laws that will govern this action. The parties do not dispute that "[a]ny subclass proposed ... [must still] independently meet all of the requirements of subsection 23(a) and at least one of the categories specified in subsection (b)." 1 Joseph M. McLaughlin, *supra*, § 4:45. Thus, when addressing Rule 23(a)(1), the parties agree that it is each subclass that must be sufficiently numerous.

The briefing does not present the Court with the more difficult question of whether these subclasses effectively lower plaintiffs' burden of showing predominance and superiority of the class as a whole. *See id.* (observing that "[t]he proponent of certification ... cannot evade compliance with the requirements of Rule 23 by dispersing class members among subclasses," but also noting that "[a] minority of courts has employed subclasses to facilitate the certification of nationwide classes, choosing to separate claimants into smaller blocks based on the similarity of their states' laws"); *In re Diamond Shamrock Chemicals Co.*, 725 F.2d 858, 861 (2d Cir.1984) (holding that the district court's "intention to create subclasses as dictated by variations in state law," given the "need for a single dispositive trial on the common issues," the "use of subclasses corresponding to variations in state law" was not "palpable error remediable by mandamus"). Plaintiffs purport to satisfy Rule 23 without referring to the subclasses—that is, they argue that the common issues among technicians from all states (and all subclasses) dominate the inquiry, making the class action a superior method of adjudication.

A. Rule 23(b)(3) (predominance) and Rule 23(a)(2) (commonality)

■ The "predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Windsor*, 521 U.S. at 623, 117 S.Ct. 2231. It is a related but more demanding criterion than the commonality requirement. *See id.* at 623–24, 117 S.Ct. 2231; 5 Moore et al., *supra*, § 23.23[6] (noting that the two criteria merge as predominance necessarily entails commonality); C. Wright, A. Miller & E. Cooper, 17A *Federal Practice and Procedure* 3d § 1778 (2011) (commonality alone is insufficient to find predominance as the Court is "under a duty to evaluate the relationship between the common and individual issues"). Because the commonality requirement is subsumed by the predominance inquiry under Rule 23(b)(3), the latter of which also consumes most of the parties' arguments and presents the closest question for certification, this is where I begin.

■ The predominance requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Myers*, 624 F.3d at 547. Stated differently, if adjudicating the class representatives' claims "will effectively establish a right of recovery for all other class members without the need to inquire into each individual's circumstances" or "if the same evidence will permit each class member to make a prima facie showing," then the test is met; but if "the evidence needed to make a prima facie showing on a given question requires members of the proposed class to present evidence that varies from member to member, then it is an individual question." 1 Joseph M. McLaughlin, *supra*, § 5:23.

■ In making this determination, I must focus primarily on the question of liability. "Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir.2001). If necessary, the Court can "employ [Rule 23(c)(4)(A) ] to certify a class as to liability regardless of whether the claim as a whole satisfies Rule

23(b)(3)'s predominance requirement." *In re Nassau County Strip Search Cases,* 461 F.3d 219, 227 (2d Cir.2006); *see also* C. Wright et al., *supra,* § 1778 (noting that the Second Circuit's approach is consistent with the Court's power under Rule 23(c)(4)(A) to maintain a class with respect to particular issues); 1 McLaughlin, *supra,* § 4:43 (suggesting that although *Nassau County* rejects the majority view advanced by the Fifth Circuit that Rule 23(c)(4) is only a procedural device and "not a vehicle to facilitate certification," it is consistent with the notion that the predominance requirement is not met where the "key issues going to liability require individualized proof").

### 1. Business Expenses

 Plaintiffs seeking to represent a subclass from every state involved here other than North Carolina allege that defendants require plaintiffs to bear business-related expenses, which has the effect of bringing their wages below the rate permitted by the individual states. Plaintiffs, who work on commission, describe their compensation as follows: what the customer is charged determines how much in expenses plaintiff is reimbursed by defendants, as the reimbursement is maintained at a fixed 15% rate of the customer charge.[3] The commission is based solely on the type of job they perform. Plaintiffs are not required to (although they may) submit expense verifications—if they do not, the entire commission is paid as wages. Defendants therefore, according to plaintiffs, do not provide increased reimbursements where higher expenses demand them.

Some of the expenses borne by plaintiffs come from owning and maintaining their vans. Defendants' employee manual, plaintiffs state, sets out in detail the specifications of these vans, compliance with which is insured through regular checkups by defendants. In practice, plaintiffs are required to pay for their vans' insurance and operation, including paying for gas, tolls, and parking.

Defendants disagree that they have a uniform policy regarding business expenses. Technicians in some branches purchase their own vans; others drive company vans. The former generally pay for the upkeep of the vans and other expenses while the latter do not. Defendants also point to variation of the type of work that technicians perform— those performing, for example, excavation work, are generally not required to buy their own vans. The same goes for other business expenses, according to defendants, as some technicians are required to purchase tools while others are not. As for reimbursement, defendants claim that some technicians never even submit expenses.

The factual variations, defendants contend, are compounded by the differences in the laws of the individual states. Each jurisdiction sets its own minimum wage and some permit an employer to make deductions for tools, thereby obviating any potential liability under this claim in those states. Defendants conclude that the "necessity and inefficiency" of addressing these differences make class treatment inappropriate.

I disagree. One of the key common questions here includes whether plaintiffs' expenses were business related. Defendants seem to concede that they were and that, at least by type, they did not vary from branch to branch or even from technician to technician performing the same jobs. Plaintiffs focus their claim on "substantiated expenses," which according to defendants' own Policies & Procedures Manual, has a specific meaning—the term includes only work-related expenses for which technicians must provide "original, detailed expense receipts."[4] The manual also states that technicians are able to receive "an immediate tax deduction." As a result, as plaintiffs explain, some technicians choose to submit substantiated business expenses; others do not, but list them on their tax returns. Either way, the common

---

3. This formula may be slightly different in California as defendants have submitted evidence showing that technicians are paid based on both the revenue and profit from the jobs they perform.

4. The handbook lists the expenses that are considered "substantiated" (e.g., "van payments, van insurance, uniforms"), and ones that are not (e.g., newspaper, cell phone charges).

element to all members of the class is the significance of "substantiated expense," identified either in the class members' federal tax returns or in defendants' own records; it is an undisputed work-related expense.

Defendants instead argue that plaintiffs received a different level of reimbursement and that some technicians did not need to spend any out-of-pocket money on certain tools and expenses. Plaintiffs contend that this is "irrelevant." For all members of the class, they explain, expenses can be gleaned from the technician's federal tax returns or from defendants' own payroll records. The expenses incurred by each technician, they continue, are therefore of no moment; plaintiffs will add all the documented expenses and see if they were so large as to reduce the technicians' wages below the minimum, which will presumably be calculated by gleaning the total hours worked divided by their total commissions. This formula would allow for adjustments to, for instance, account for the reimbursements that some technicians received; the reimbursements can simply be added to reduce the total business expenses.

I am persuaded that plaintiffs' proposed plan, substantiated by the record, is an effective and economical method of adjudicating the claims, and that defendants' main argument under the predominance inquiry—that class treatment would be inefficient given the many differences among class members—is without merit. Cf. *Myers*, 624 F.3d at 548–49 (affirming this Court, holding that the inquiry into a particular employee's job characteristics and duties to determine whether he is exempt under the FLSA is an individualized inquiry, which defeats predominance).

Both parties, however, vacillate between arguments of efficiency and generalized proof, assuming that because the two often go hand in hand—claims that are susceptible to generalized proof will invariably result in efficient class treatment—the presence of one necessarily means the presence of the other. To illustrate, defendants argue that the business expense claim is not susceptible to generalized proof and class treatment is therefore inefficient; plaintiffs say that's not so—one witness can interpret all the records,

making the presentation quite efficient, as it will be unaffected by any of the differences.

Plaintiffs do not acknowledge that the proof establishing liability will be individualized even if it can be aggregated. This is not the case, for instance, where witness testimony can establish that salaries were paid at an hourly rate and that the rate was below the minimum wage, which would tend to prove liability for all class members even if damages would have to be determined on an individual basis. But the bar for predominance is not set quite so high; "predominate should not be automatically equated with determinative." C. Wright et al., *supra*, § 1778.

The question before the Court is therefore what part, if any, efficiency plays in the predominance inquiry of Rule 23(b)(3). A cursory review may suggest that it plays no role. For instance, the Eleventh Circuit in, *Jackson v. Motel 6 Multipurpose*, 130 F.3d 999, 1006 (11th Cir.1997), observed that Rule 23(b)(3) imposes two requirements, "and increased efficiency is only one of them." A closer look, however, reveals that *Jackson* is talking about a different kind of efficiency. There, the lower court found predominance where a defendant company was accused by plaintiffs of having a policy or practice of discriminating against patrons and its employees. The court based in its decision on the fact that "forum-by-forum resolution of each and every issue in this case ... would be far less efficient, cost-effective, and uniform than class resolution." *Id.* at 1005–06. The Eleventh Circuit granted mandamus relief, implying that the district court conflated predominance and superiority; just because class treatment is more efficient than adjudicating the claims individually, the Court explained, does not mean that the common question of discrimination is rendered predominant over all other issues in the class.

The efficiency that plaintiffs draw on here, however, is based not on juxtaposing class treatment with individual lawsuits—an exercise that I agree is reserved exclusively to the superiority inquiry—but on the proof that would be offered in the class action to establish a crucial element of the claim. I find that under Second Circuit law, this fea-

ture of plaintiffs' claims is an appropriate factor that I must weigh in determining whether the common questions predominate over individual ones.

*In re Nassau County Strip Search Cases,* 461 F.3d 219 (2d Cir.2006), the Second Circuit addressed a class claim from misdemeanor detainees against defendants who subjected the detainees to a strip search policy. The district court had previously found that the policy violated the Fourth Amendment. Plaintiffs subsequently brought several lawsuits under, 42 U.S.C. § 1983, alleging that they were strip-searched pursuant to the policy; they later moved for consolidation and class certification. The district court denied the motion for certification based solely on the question of predominance. According to the court, the individual issues that would overshadow the common ones included proximate causation, damages, and presence of reasonable suspicion for each detainee. The court faced several motions to reconsider, with accompanying modified proposed definitions of the class, which the court denied.

The Second Circuit reversed. The Court began by noting the purpose of Rule 23(b)(3), which is to promote class treatment if it, *inter alia,* achieves "economies of time, effort, and expense." *Id.* at 225 (quoting Fed. R.Civ.P. 23(b)(3) adv. comm. n. to 1966 amend.); *see also Myers,* 624 F.3d at 547 ("The requirement's purpose is to ensure that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' "). The Second Court found three errors, one of which was that the district court's holding that defendants' concession about the illegality of the policy eliminated a common liability issue from Rule 23(b)(3)'s predominance analysis. The Second Circuit explained: "That the class-wide proof comes in the form of a simple concession rather than contested evidence certainly shortens the time that the court must spend adjudicating the issue, but it does nothing to alter the fundamental cohesion of the proposed class, which is the

central concern of the predominance requirement." *Id.* at 228; *see also* 5 Moore et al., *supra,* § 23.45[1] (explaining that a different conclusion would discourage class treatment in cases where liability is clear). The Court also observed that when plaintiffs are "allegedly aggrieved by a single policy ... the case presents precisely the type of situation for which the class action is suited since many nearly identical litigations can be adjudicated in unison." *Id.*

More significant for the purpose of the present issue, the Second Circuit also held that the lower court abused its discretion in finding that individual issues predominated as to liability. The Court found that the determination of class membership—limiting the class to individuals who were strip-searched—to be "simple," as it could be determined from defendants' own records. *Id.* at 229. The only individualized liability issue, the Court explained, was whether some plaintiffs were strip searched based on a reasonable suspicion rather than the general policy. This was not enough to defeat predominance because "any such reasonable suspicion inquiries will be *de minimis.*" *Id.* at 230.

Thus, efficiency played a role in *Nassau County,* not just in the standard articulated by the Court, but in its pragmatic application, with the Court weighing whether the individualized inquiry would be tolerable given the elements that were common to the proposed class. The Court found those inquiries to be simple, in part because they could be made from defendants' own records. So too will the individual inquiry be tolerable here; under plaintiffs' proposed trial plan, the individualized questions of liability will be established through records that can be interpreted by a single witness. *See also,* 2 Alba Conte, *William B. Rubenstein & Herbert Newberg,* Newberg on Class Actions § 4:24 (4th ed. 2010) (quoting Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I),* 81 Harv. L.Rev. 356, 389 to 390 (1967)) (The object of the functional tests of Rule 23(b)(3) is to get at the cases where a class action promises important advantages of economy of effort and uniformity of result

without undue dilution of procedural safeguards for members of the class or for the opposing party.).

■ The inquiry will be predominated by common questions. First, plaintiffs seek to represent a class that was aggrieved by the same policy of paying wages to technicians without regard as to whether business expenses bring those wages below the established minimum wage. Second, defendants seem to concede that "substantiated business expenses," as they will be gleaned from their own records or plaintiffs' tax returns, necessarily mean work-related expenses. As *Nassau County* teaches, this concession does not make the common element any less prominent. Third, the evidence shows that business expenses were accounted by defendants in the same way. I find that given the efficiency with which the individualized inquiry will be presented at trial, these common questions to predominate.

Defendants' concern about the different state laws is also overblown. First, they claim that the varying minimum wage laws in different states prevent class treatment. They raise various potential legal questions, such as whether it is "permissible for wages to fall below the minimum wage when expenses are deducted" and the "extent to which business expenses properly may be deducted from commissions." Except for the differences in the minimum wage established in each state, and the legality of deductions in two states, discussed below, defendants do not point to any specific provisions of the laws involved in this case to suggest that the answer to any of the questions they raise would be different. For instance, I agree with plaintiffs that it is implicit in the adoption of minimum wage laws that deduction of work-related expenses is prohibited if it has the effect of bringing the earnings below the established minimum wage. As for the different amounts at which minimum wage is set in the states, under plaintiff's trial plan, it would simply require the use of 13 different formulas, which again, has hardly the makings of mini-trials when the variables plugged into the formulas can be established efficiently through the testimony of one witness, interpreting the same records.

Defendants cite two statutes, Washington's and Minnesota's, to suggest that "some states" do indeed permit deductions for expenses. But defendants do not contend that either statute would apply here. That is, they do not point to any evidence to suggest that plaintiffs used their tools outside of their employment, *see* Minn.Stat. § 177.24(4)(2) (2010), or that defendants did not derive financial benefit from these expenses. *See* Wash. Admin. Code § 296–126–028(2) (2011). Even if these statutes present questions of fact—which defendants have failed to articulate—I cannot find that the minimal individual subclass issues these statutes present would overtake the more important common questions presented to the whole class.[5]

In short, plaintiffs have met their burden to show that the common questions of law and fact will dominate in establishing that plaintiffs' business expenses that were not reimbursed had the effect of violating the various state minimum wage laws. Although the necessity of applying different state laws can sometimes defeat class certification, *see, e.g., Bridgestone/Firestone Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1018–20 (7th Cir.2002), the differences, as they apply to plaintiffs' theory of the case, are minimal. To be sure, the hours and commissions that will be aggregated for the formulas that plaintiffs will use to establish liability must be collected from evidence that is individual to each member of the class; and the formulas will be individual to each subclass to account for the different minimum wage in each state. But I find this individualized proof to be dominated by the three common elements.

### 2. Uncompensated hours claim

■ Plaintiffs from all states except North Carolina seek certification on the

---

**5.** Elsewhere in their brief, defendants mention that some plaintiffs use their vans for personal reasons. It is unclear whether plaintiffs intend to add the cost of the vans themselves (as opposed to the work-related costs only, such as making sure that the vans are compliant with defendants' rules) to show that defendants were not paying plaintiffs minimum wage. If plaintiffs pursue this theory at trial, then the Court may have to adjudicate the question for the Minnesota subclass only, which as I find above, is not enough to defeat predominance.

claim that defendants have not compensated the proposed member class for all the hours that they have worked. Specifically, they allege that until recently, they have not been able to record "administrative, training or meeting time; only someone in the branch office or dispatch could enter those times." Additionally, plaintiffs claim that they were not compensated for the time they spent maintaining their vans, equipment, and for attending mandatory meetings. They were also not compensated for performing "turn-in"—a process that requires plaintiffs to "reconcile their invoices, receipts, and expenses and present them to their branch office." For many of the technicians, they explain, this is the only time they have to come to their branch office, and for all of them, this has to be done outside of their regular hours. Plaintiffs use this time to perform other job-related tasks such as replenish their inventory of parts, take inventory of their vans, and attend training.

Plaintiffs also allege that time records are routinely altered to reduce overtime, and that this can be proven through defendants' database which shows the original time entry. This impermissible time shaving, plaintiffs submit, took place at multiple branches and has been admitted by defendants. Despite knowledge of this practice, allegedly spanning multiple branches, defendants have taken no steps to prevent it, which to plaintiffs suggests acquiescence.

Defendants respond by pointing to the differences in overtime compensation, which the employee handbook explains is based on the different laws in each state, and to the different work schedules among technicians working in all the branches. With regard to the turn-in time, defendants submit different testimony offered by plaintiffs, showing that the length of time for turn-in varies from technician to technician and that some put this time on the clock. There are other inter and intra-branch differences, defendants claim, citing testimony from some plaintiffs who perform turn-in by simply dropping off their paperwork and others who were compensated for it. Defendants contend that the same is true for other meetings and for time spent on maintaining vans and equipment—variations in whether this time was on the clock and in its duration eclipse the similarities.

As for overtime pay, defendants state that plaintiffs cannot show any instance where any plaintiff was entitled to overtime pay and did not receive it. In fact, defendants continue, many technicians admit that they were not encouraged to incorrectly record time. Defendants also contend that as some plaintiffs have admitted, time-shaving can be done for legitimate reasons, such as when a technician forgets to log-off the program that records his hours. Determining whether time alteration was appropriate in each instance, defendants argue, is a highly individualized inquiry. Responding to plaintiffs' contention that defendants have admitted impermissible time-shaving, defendants state that this is a misreading of the report that specifically notes that it does not address manipulation at any branch other than the one that was being investigated.

Finally, defendants contend that "[u]nder well-established law ... off-the-clock and time shaving claims are inherently inappropriate for class certification." They cite several cases in support, but rely most heavily on, *Driver v. AppleIllinois, LLC,* 265 F.R.D. 293, 313 (N.D.Ill.2010). In *Driver,* plaintiffs were tipped employees working at one Applebee's restaurant. They sought class certification for three different classes to include employees from all 34 restaurants located in Illinois. In Illinois, employers can calculate as part of the hourly wage rate an allowance for gratuities for those employees whose wages customarily include tips. Plaintiffs alleged that defendant failed to pay the putative class members overtime, compensate for all the hours worked, and used tipped employees, who earned sub-minimum wages, to perform non-tipped duties.

After certifying classes for some of the other claims, the Court denied certification for the claim that defendant failed to pay for all of the time worked by its employees, "either by requiring 'off the clock' work or by altering time entries." The Court found that although there was evidence of time alteration, the practices appeared sufficiently different from restaurant to restaurant to merit certification. Plaintiffs, the Court explained,

"have not established that there is a common method of proof to demonstrate liability as to all members of the class who worked at more than 30 different restaurants." *Id.* at 315.

I find *Driver* distinguishable and the inquiry for the off-the-clock claim to be dominated by common questions. The evidence shows that turn-ins and meetings are sufficiently common to all the branches, even if there is some variation in their duration. Like with the business expense claim, I find this commonality to dominate the individual inquiry. Again, defendants do not appear to dispute that there is evidence that some technicians were not compensated for these work-related events. And again, there are variations as to who was compensated and who was not, who participated in meetings and who did not; but under plaintiff's trial plan, these differences are overshadowed by the commonalities.

The turn-in documents are time-stamped to reflect when they are first printed; defendants' other records also provide the time when, after a technician reviews the turn-in material, he submits those documents. That time, plaintiffs explain, can then be compared against defendants' payroll records to see if each plaintiff was on the clock for these activities. Like with the business expense claim, the inquiry is individual in part, requiring individualized proof to show when a class member was off-the-clock, but it will be proven efficiently—*i.e.,* with the addition of each class member's claim not greatly altering the amount of proof to be weighed by the jury. *Cf.* 1 McLaughlin, *supra,* § 5:23 ("If . . . the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relative undisturbed, then common issues are likely to predominate.") (quoting *Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256 (11th Cir.2009)).

The authority on which defendants rely is inapposite. Plaintiffs in *Driver* did not appear to contend that defendants' records contained the type of specificity present here that would obviate the need for individual testimony. The significance of this distinction is, in fact, on display in *Driver* itself, where the Court certified a class on the claim that defendant used tipped employees to perform non-tipped work. The Court observed: "Because all of the time and payment records for all of the class members have been recorded and maintained under a centralized POS system, the evidence to determine whether in practice employees were paid minimum wage for time spent in duties unrelated to their tipped occupation can be efficiently presented." *Id.* at 312–13.

The same is true here—plaintiffs will use defendants' records alone to present their claim. Defendants' reliance on *Doyel v. McDonald's Corporation,* No. 4:08–CV–1198, 2010 WL 3199685, at *6–7 (E.D.Mo. Aug. 12, 2010), where the Court explained that liability for plaintiffs' off-the-clock claim would require *testimonial* evidence, is therefore also misplaced. The remaining authority that defendants submit fares no better. For instance, *In re Wal–Mart Wage & Hour Employment Practices Litigation,* No. 206–CV–00225, 2008 WL 3179315, at *19–21 (D.Nev. June 20, 2008), is distinguishable because an intensive individualized fact inquiry there would have been required to rebut an innocent explanation for the apparent off-the-clock work shown by the discrepancy between the payroll record and cash register login time, such as another employee working at the cash register.

The claims here are different from the usual off-the-clock cases and may indeed be unique. I suspect that it is unusual for employers to maintain time records that are so specific that a fact finder could determine how many off-the-clock hours plaintiffs have worked from those records alone. Nor is it common that employees in different branch offices, scattered among different states, regularly perform the same type of activity that is indisputably work-related and, based on the evidence submitted, indisputably uncompensated (at least some of the time for some of the plaintiffs). But it is common here and that commonality dominates the inquiry, not least because any differences among plaintiffs would not require testimonial evidence. *See, e.g., Burch v. Qwest Communs. Int'l, Inc.,* 677 F.Supp.2d 1101, 1128 (D.Minn.2009) (notwithstanding the individual inquiries that would have to be made into off-the-clock activity, finding the predominance inquiry

satisfied because that activity, under the narrowly defined class, was common to all the class members).

The question is somewhat closer for the time-shaving claim—the claim that defendants have impermissibly altered plaintiffs' recorded time so that they are not compensated for all of their hours, including for hours that require an overtime premium. First, plaintiffs misstate their claim when they argue that any hours-shaving that took place at various branches was a result, "at least in part" of defendants' "national policy to do nothing to stop this violation." Defendants either have a company policy of time-shaving or they do not. What plaintiffs complain of in this action are practices of time-shaving among branch offices—practices for which defendants can still be liable of course. But that's practice, not policy. To suggest that there is a national policy is to pretend that there is an easy common target, and to make the question of certification less difficult than it is. *Cf.*, *Brickey v. Dolgencorp, Inc.*, 272 F.R.D. 344 (W.D.N.Y.2011) (denying "conditional certification" under the FLSA where the common policy was not on its face illegal and not one that in effect forced managers to violate the FLSA).

Second, defendants point out that time records can be altered for legitimate reasons; plaintiffs' own testimony supports this. For instance, one plaintiff provides a hypothetical technician not logging off at the end of the day, being approached about his time, and receiving a subsequent—proper—alteration of his time records. Another plaintiff states that the "problem [of inaccurate long hours] would be corrected." At first glance, then, certification for this claim appears to suffer from the type of deficiency articulated in, *In re Wal-Mart*, 2008 WL 3179315, as each claim of time alteration would be met by a viable affirmative defense that would require an individual inquiry. *See* 1 McLaughlin, *supra*, § 5:23 (the predominance inquiry should take into consideration affirmative defenses).

But I am again persuaded that this case is different. According to plaintiffs, their claim focuses only on those alterations "where the records themselves demonstrate that it is more likely than not that no legitimate reason for the alteration exists." A certain job (one that is commonly done by the technicians in the putative class) may, for instance, plaintiffs explain, normally take two hours to complete but the technician would be credited for only two minutes.[6] This discrepancy would reveal a "temporal impossibility" and would conclusively show time-shaving. I may have otherwise been skeptical of plaintiffs' ambitious claim that there would be sufficient instances of "temporal impossibilities" for the jury to conclude that defendants impermissibly altered time-records on a class-wide basis, but there is evidence suggesting that plaintiffs' plan is not only plausible but sufficiently sound that defendants have themselves employed it to investigate fraud.[7]

**6.** Plaintiffs cite to the deposition of Gary Sander, to suggest that defendants have "established the normal time that any given job should take." The excerpt cited does not reveal any such standard or for that matter any relevant discussion. Nevertheless, because defendants do not dispute that the jobs performed by plaintiffs are substantially similar, even if defendants have not formulated an expectation for how long each job should take, plaintiffs can establish the general norm through class-wide evidence at trial, such as live testimony of Sander.

**7.** Plaintiffs also offer the testimony of a former administrator at a New York branch—not a plaintiff or a member of the proposed class—who states that the General Manager of that branch told him that technicians should not show more than 40 hours of work per week and to alter timesheets if they do. She understood the directions to come "from up above … at least the

regional level." An assistant to a manager of an Ohio branch echoes this testimony: "If a Technician's time sheet showed overtime hours, [the manager] would usually tell me, or he would tell the Technician to tell me, to reduce the time shown on the time record." Plaintiffs have also submitted Eric Eaton's testimony, who is defendant Chemed Corporation's Director of Internal Audit and Compliance. He reported that an Atlanta branch was reducing technicians' hours "in an effort to reduce premium pay expense." Although this may be branch-wide or even state-wide evidence, it does not pertain to the whole class, particularly since there is testimony from other branches, submitted by defendants that point to different practices. In any event, because I am persuaded that this testimony is not required to establish liability, I do not decide at this stage whether it will be permitted for plaintiffs' case in chief.

Defendants' Rule 30(b)(6) witness, Gary Sander, Executive Vice President of Roto–Rooter, testified that he was involved in reviewing a complaint of improper time alterations in the Hartford, Connecticut branch and was able to conclude—presumably to a degree of certainty surpassing the preponderance of the evidence standard to be applied at trial—that the branch was committing fraud. He appeared to base his conclusion solely on electronic records.[8] He did not apply this method to any other branch because he "wasn't asked to." Plaintiffs will be asked to do that now. They have already asked Sander in his deposition to explain altered time entries for three jobs performed by one of the plaintiffs for which defendants received hundreds of dollars from the customers, but for which plaintiff was credited one or three minutes. Sander's only meaningful response was that he would need more records to reach a conclusion as to whether the changes were permissible, which points again to the ease of the presentation of the individualized questions.

Defendants' explanation why the method they used to find impermissible time-shaving at one branch cannot be used at the other branches is unpersuasive:

> In that instance, however, Mr. Sander's query sought a particular type of time alteration that created a temporal impossibility and was therefore readily identifiable

as improper. While Roto–Rooter's databases require a reason code to be entered each time an employee's time records are changed, Mr. Sander cannot formulate a query to determine whether the reason given in each instance is accurate—he can only determine that a change was improper if it resulted in a temporal impossibility. Indeed, the inquiry plaintiffs propose would require a time entry by time entry review of time records related to each plaintiff and testimony from each plaintiff and his manager.

I am not convinced that an analysis of the time records—a search for "temporal impossibilities"—in all of the branches would involve more of an individualized review than an examination of the records from the Hartford branch even if the other branches shave time differently.

If defendants are suggesting that the national review would be too time-consuming so as to be unmanageable, that argument is rejected; "clockwatching is not very helpful in ascertaining whether class-action treatment would be desirable." C. Wright et al., *supra,* § 1778 (citing *In re Nassau County Strip Search Cases,* 461 F.3d at 228). Even if a witness had to spend considerable time testifying on the time records from the branches of all 13 states, the common issues—*e.g.,* the time records, the performed jobs, rate of pay, the alleged practice of time-

---

8. Sander testified in relevant part:

Q. When you were doing the work with respect to the—with respect to the Hartford case, were you auditing the company's records to see if there was inconsistencies in the time records? . . . Were you reviewing the records?
A. Yes.
Q. To see if there was any inconsistencies, is that right?
A. Yes . . .
Q. So, they were cutting the end time of the day short, is that right?
A. They were cutting the time a job was completed in that particular day a—represent at the end of the day.
Q. *Okay. And how did you figure that out?*
A. *I was able to go in and analyze the records. That took some time.*
Q. *And what did you do to analyze the records?*
A. *I reviewed certain deleted records based upon a query that we developed and a rather complex review of the data through a series of*

*queries, and were able to sort records down such that we didn't have to deal with volume of every record, but tried to reduce the volume down to a manageable amount so that we could review the data.*
Q. *And as part of that process, did you have to review any hard copies of the records?*
A. *No, sir*
Q. *So, you didn't have to review any individual invoices, is that right?*
A. *No, sir*
Q. Okay. But you were able to detect the fraud through the electronic records that existed, is that right?
A. Yes, sir. . . .
Q. You said it could be changed to lengthen it. It would have had to lengthen it from something to one minute.
A. I'm just saying it could have-no. If they changed both beginning and end time.
Q. But all that information is in the system, right?
A. All the deleted records are available.

shaving—will still dominate the inquiry, as one witness can potentially testify regarding all of the records. *See id.* ("It seems specious and begging the question to say that if these 500 law suits were brought into a class so that proof on the issues of conspiracy need be adduced only once and the result then becomes binding on all 500, that thereby the common issue of conspiracy no longer predominates because from a total time standpoint, cumulatively individual damage proof will take longer.") (quoting *Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 569 (D.Minn.1968)).

Thus, I find that the inquiry for determining whether members of the proposed class were not compensated for time shaved from their actual hours of work, time spent at turn-in and other meetings, and time spent maintaining their vans and work equipment, to be dominated by common issues of fact and law.

Plaintiffs, however, have not established that predominance of common questions can be found with respect to other failures by defendants to compensate technicians. The Court's finding of predominance thus far rests in large part on the evidence that defendants have shaved time (at least in some branches), and on the evidence that turn-in and other employee meetings, as well as maintenance of tools and work equipment is indisputably work-related and common to the class. It is therefore necessary, before proceeding with the rest of the Rule 23 inquiry, to modify the proposed class to exclude the phrase "for all hours of work, including, but not limited to." *See* 5 Moore et al., *supra*, § 23.21[6] ("The court may, in its discretion ... modify the definition of the proposed class to provide the necessary precision or to correct other deficiencies. In fact, the court has a duty to ensure that the class is properly constituted and has broad discretion to modify the class definition as appropriate to provide the necessary precision."). For this claim, I continue with a class definition that seeks relief for defendants' failure to "compensate Technicians for time shaved from their actual hours of work, time spent at turn-in and other meetings, and time spent maintaining their vans and work equipment."

### 3. Illegal Deductions

Lastly, except for plaintiffs from Florida and Hawaii, plaintiffs seek class certification on the claim that defendants had the national policy of reversing commissions that had been previously paid to plaintiffs for a variety of impermissible reasons, as they did not obtain written authorizations for the reversals. Plaintiffs provide three examples: "(1) customer bad checks or stop-payments; (2) call-backs for warranty service; and (3) refunds issued to customers complaining about service." Payroll records, plaintiffs state, reveal these deductions.

Defendants dispute that a national policy exists on "adjustments" and point to the employee handbook that explains that there are differences "depending on applicable state law and practice of the branch" as to what events trigger the adjustments. The handbook further provides that "[b]ecause commissions are subject to adjustment ... all commissions are considered advances until the invoice is paid and the warranty period expires." Certain events qualify for reversals in some branches but not others, defendants explain, and the process for authorizing them differs among the branches. Defendants also point to testimony that underlines the variations in practice—in California, for instance, plaintiffs are not reversed for call-back work. Finally, they show evidence of arrangements between technicians to share the original commission and branch managers' discretion in implementing the policy.

Plaintiffs respond that none of these variations change the common legal question of whether

the practice of reversing previously paid commissions is a wage deduction ... or is simply the reversal of an advance prior to the final wage. If the reversals are found to be part of the calculation of the final wage, then no class member has a claim because, by definition, there has been no "wage deduction." On the other hand, if the reversals are determined to be wage deductions, then it is simply a matter of applying state law to determine whether the deduction is legal. If a deduction for call backs is illegal for one member of a

state class, it will be illegal for all members of the class in that state.

Plaintiffs further argue that because nine of the twelve states categorically prohibit reversals and the other three allow them only with contemporaneous authorizations, proving this claim will not be unmanageable in a class action; in the states where authorizations are required, the jury would only be asked to review the produced forms and determine whether they are adequate.

I again find that the common questions dominate plaintiffs' claim. The employee handbook provides examples of when "adjustments" to commissions can be made; plaintiffs focus on three, but there are others, which appear more reasonable, such as instances when the commissioned technicians use hourly paid employees for help or when the technicians fail to obtain billing information from the customers as they are required to do. The list is not meant to be exhaustive, and defendants have supplied evidence supporting the contention that managers use discretion in implementing deductions. Plaintiffs, on the other hand, have not pointed me to any evidence suggesting they could cull defendants' records to focus the inquiry on a particular type of reversal, the permissibility of which the Court could then evaluate.

But plaintiffs' contention seems to be that *any* reversal—unless it is followed with a contemporaneous authorization—is impermissible under the laws of the all the states regardless for its reason. Whatever I may think of the merits of this argument, the question I must answer is whether plaintiffs have met their Rule 23 requirement. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.") (citation and quotation marks omitted); *see also In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 33 (noting that a merits inquiry is necessary only if it is intertwined with a Rule 23 requirement).

The predominance test here is readily satisfied. Defendants' records, which appear to be substantially the same from all of the branches, show when reversals—made pursuant to defendants' common policy articulated in the handbook—are made. I reject defendants' contention that even this legal question will require individual inquiry because, as they explain, courts ordinarily consider employment contracts to determine whether a commission is earned or is an advance. This argument only highlights another commonality—identical or substantially similar employment contracts between defendants and their commissioned technicians.[9] Thus, while it does appear that managers apply (or choose not to apply) reversals for reasons that vary from branch to branch, these individual differences are not only overshadowed by the common elements of the inquiry, but are simply irrelevant; if *any*

9. Defendants dispute this point in their opposition: "Contrary to plaintiffs' mischaracterization of [the Rule 30(b)(6) deposition of Gary Sander, Executive Vice President of Roto–Rooter], Technicians paid by commission are not all subject to the exact same pay and record-keeping policies." The mischaracterization here is defendants'. In the cited testimony, Sander states that the only differences between the jobs of two technicians are, quite predictably, job responsibilities and commission rates:

> Q. So, their commission rates may be different. Is the commission program different for them, or is it just the rate itself?
> A. Generally speaking, it's just the rate.
> Q. Any other differences in general?
> A. To my knowledge, not specifically.

California's policies are better support for this argument. Defendants have submitted an employee handbook from California that was apparently issued in 2009. California, like other states, has its own policy for calculating overtime, allowing meals and rest-breaks; and as I noted above, it may also have a slightly different formula for calculating compensation. California appears to have more favorable policies for its employees—Sander affirms in his declaration that no deductions are taken for substantiated business expenses and there are no full reversals for call-backs and no charge for collection-related issues. But none of these differences defeat class certification as they do not preclude liability from being established efficiently. If technicians share more of the profit, then defendants are less likely to run afoul of the California minimum wage law; if substantiated business expenses are not imposed and reversals are not made, then plaintiffs are less likely to establish liability for the nationwide class, or if they do, California class members will recover nothing.

kind of reversal without a written authorization is impermissible, then regardless of "employee culpability" (one inquiry defendants insists needs to be made), the question of liability will be disposed of without the need for individualized proof.

Two points are worth mentioning here. First, I note that if plaintiffs' argument proves too ambitious—if they begin to move away from the sweeping claim that any kind of reversal without an authorization is impermissible—they will not maintain the class with respect to this claim. *See* Fed.R.Civ.P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ("Even after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation. For such an order ... is inherently tentative"). Unlike the uncompensated hours claims, defendants records, at least as presented to me on this motion, would not make the instant claim susceptible to an efficient presentation; while the records reveal when a technician was not compensated for a meeting he attended or when his time was impermissibly altered, plaintiffs do not contend that the records similarly show the reasons for a reversal of a commission. Therefore, if even one ground for a reversal that defendants have employed is permissible, then the action would devolve into individual adjudications of each reversal that would be anything but *"de minimis"* or "simple." *Nassau County,* 461 F.3d at 230. I fully expect that this claim, at least with respect to the states where contemporaneous authorizations do not come in to play, will be resolved on summary judgment—if no reversals are permitted by law, defendants will be liable.

### B. Rule 23(b)(3) (superiority)

Rule 23(b)(3) provides a list of factors that courts should consider—factors that have been interpreted to pertain to the superiority inquiry, *see id.* at 230; 1 McLaughlin, *supra,* § 5:63:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

This list is not meant to be exhaustive and the Court has discretion to consider other relevant factors. *See* C. Wright, et al., *supra,* § 1777. "At bottom, the superiority analysis requires (1) consideration of the alternative methods of adjudication available for the claims, (2) a comparison of the fairness to all whose interests are implicated between any alternative methods and a class action, and (3) a comparison of the efficiency of each method in adjudicating the claims." 1 McLaughlin, *supra,* § 5:63.

The superiority inquiry directs the Court to compare alternative methods of adjudication. 5 Moore et al., *supra,* § 23.46[1]. If this evaluation reveals no other "realistic possibilities," then the element is satisfied, particularly when the action is "predicated on a statutory mandate that is designed to promote the private rectification of conduct thought undesirable." C. Wright et al., *supra,* § 1779. On the other hand, when the interests asserted "vitally affect a significant aspect" of plaintiffs' lives, involving a "high degree of emotional involvement," like personal injury actions, they are rarely suitable for class treatment because each claimant will have a "legitimate interest in litigating independently." 1 McLaughlin, *supra,* § 5:64. After making this comparison, if the Court concludes that the class action is still a "fair and efficient method of resolving the case," then certification is proper. *Nassau County,* 461 F.3d at 230.

As the Seventh Circuit has explained in the context of a mass tort case, efficiency may be lost when the class action is set against the laws of multiple states. *See In re Bridgestone/Firestone Inc.,* 288 F.3d at 1018–

20; [10] *see also Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir.1993) ("Instructing a jury on the laws of multiple jurisdictions ... will pose management difficulties and reduce the judicial efficiency sought to be achieved through certification."). Geographical dispersion of the members of the putative class alone, however, does not necessarily mean that a class action is not the superior method. *See, e.g., Riordan v. Smith Barney*, 113 F.R.D. 60, 66 (N.D.Ill.1986) (weighing this factor in favor of finding superiority).

 Drawing on the factors enumerated by Rule 23(b)(3), plaintiffs argue that class treatment is a superior method of adjudicating their claims. They assert that: (1) the individual damages at stake here are minimal, suggesting that individual plaintiffs would have little interest to control the prosecution of their claims; (2) plaintiffs have not instituted any pending FLSA actions against defendants outside of this action; (3) the Court would resolve legal and factual questions about defendants' policy and practices together in one forum; and (4) there are no manageability concerns as courts frequently certify multi-state class actions arising out of the same nucleolus of facts where there are parallel FLSA claims.

In response, defendants argue that certification of plaintiffs' claim will create a "case management nightmare and result in overwhelming and incurable jury confusion." They cite cases where courts have refused to certify nationwide class actions because they found the prospect of applying multiple state laws to be unwieldy. The different legal standards here, defendants claim, include basic definitions of key terms, such as "hours worked" and "overtime;" and the laws regarding business expenses also vary by state. Defendants conclude that applying these varying standards to the different situations presented by each plaintiff, which include different work schedules, makes class treatment "patently unmanageable."

Again, defendants point to, what seems to be, every conceivable factual and legal variation without explaining how each difference would impact the adjudication of these claims. For instance, the Court appreciates that states define "hours worked" differently, but defendants do not contend that the off-the-clock and on-the-clock activities at issue here would not be considered "work" under any of the relevant laws. *Cf. Barrus v. Dick's Sporting Goods, Inc.*, 732 F.Supp.2d 243, 252 (W.D.N.Y.2010) (plaintiffs admit that showing that they worked off-the-clock did not automatically create liability).

To take another example, defendants do not argue that any of the laws allow for the fraudulent time-shaving alleged here, but focus on how "overtime" is defined in each state. If plaintiffs prove that defendants have a practice of impermissibly altering time sheets, how many of those hours should have been compensated at the overtime premium rate will, of course, be determined by the applicable state law; but questions pertaining to damages alone do not prevent certification. *See Visa Check*, 280 F.3d at 139. With regard to business expenses, as explained above, differences in the laws of each state can be accounted for in adjustments to the formulas that determine wheth-

---

**10.** Writing for the Court, Judge Easterbrook explored the notion that consolidated litigation is less efficient than separate actions. The benefits of consolidation, Judge Easterbrook wrote, are sometimes elusive:

> The central planning model—one case, one court, one set of rules, one settlement price for all involved—suppresses information that is vital to accurate resolution. What is the law of Michigan, or Arkansas, or Guam, as applied to this problem? Judges and lawyers will have to guess, because the central planning model keeps the litigation far away from state courts.... One suit is an all-or-none affair, with high risk even if the parties supply all the information at their disposal. Getting things right the first time would be an accident.... Markets instead use diversified decisionmaking to supply and evaluate information.... This method looks "inefficient" from the planner's perspective, but it produces more information, more accurate prices, and a vibrant, growing economy.

While I agree with the Seventh Circuit's observation that asking one jury to apply the laws of different states may in some instances detract from the efficiency of class action litigation, I am hesitant to adopt this market consideration as a factor in determining superiority, which would seem to prevent class certification in more cases than Second Circuit jurisprudence contemplates.

er the expenses had the effect of bringing plaintiffs' wages below the minimum.

Distinctions between state laws matter only when they create meaningful differences among the members of the nationwide class. Otherwise, a nationwide class on state claims could never be certified; state legislatures rarely speak with one voice. *See Cruz v. Hook–Superx, L.L.C.,* No. 09–CV–7717, 2010 WL 3069558, at *3, 2010 U.S. Dist. LEXIS 81021, at *13 (S.D.N.Y. Aug. 5, 2010) (collecting wage and hour cases) ("There is no per se bar to multi-state class actions. Minor differences do not defeat class certification."); *Spencer v. Hartford Fin. Servs. Group, Inc.,* 256 F.R.D. 284, 298 (D.Conn.2009) (noting that minor differences between state laws in multi-state class actions do not defeat certification). The authority relied on by defendants is therefore clearly distinguishable. *See Barrus,* 732 F.Supp.2d 243, 252 (off-the-clock claims would require proving different elements under the different laws); *Tyler v. Alltel Corp.,* 265 F.R.D. 415, 428 (E.D.Ark. 2010) (denying certification because of "outcome-determinative conflicts in states, consumer protection statutes and unjust enrichment laws.").

Plaintiffs have satisfied their burden of showing that a class action is the superior method of adjudication. It is unlikely that any of the plaintiffs would bring individual suits for the purported violations of 14 state laws—a point that defendants do not challenge. *See Windsor,* 521 U.S. at 617, 117 S.Ct. 2231. Plaintiffs will be expected to implement the trial plan they have sketched here, which is hardly a case management "nightmare."

### C. Rule 23(a) (typicality, adequacy of representation, and numerosity)

#### 1. Typicality

■■■■ The typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Brown v. Kelly,* 609 F.3d 467, 476 (2d Cir. 2010) (citation and quotation marks omitted). "The purpose of the typicality requirement is to ensure that the interest of the class representative align with those of the class, so that by prosecuting his own case he simultaneously advances the interests of the absent class members." 1 McLaughlin, *supra,* § 4:16. "As long as plaintiffs assert ... that defendants committed the same wrongful acts in the same manner against all members of the class, they establish necessary typicality." *Id.* (quoting *Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. 144, 155 (S.D.N.Y. 2002)).

■■■■ Defendants make the same arguments for lack of typicality that they make under Rule 23(b)(3), contending that the variations within branches make representatives' claims atypical. They point to other minor discrepancies in the job histories of some of the proposed representatives as compared to the class they seek to represent, such as driving a company vehicle or being paid a salary for parts of their employment. But none of these differences suggest that the representatives' interests are not aligned with those of the class. Plaintiffs' claims arise out of the same work-related events and are brought under the same legal theories. Plaintiffs complain of the same wrongful acts—impermissible business deductions, commission reversals, and practices of altering time sheets—that they allege were committed in the same manner, if not to the same degree, against all members of the class they seek to represent. The typicality requirement is therefore satisfied.

#### 2. Adequacy of Representation

■■■■ This requirement has two elements. Plaintiffs must (1) "demonstrate that class counsel is qualified, experienced, and generally able to conduct the litigation," and (2) show that "there is no conflict of interest between the named plaintiffs and other members of the plaintiff class." *Marisol A.,* 126 F.3d at 378. The second element "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 99 (2d Cir.2007) (quoting *Amchem,* 521 U.S. at 625, 117 S.Ct. 2231).

Defendants do not challenge the adequacy of the class counsel. They would be hard-pressed to; as another court recently noted, counsel's qualifications are "stellar" and this element is "easily met." *Bredbenner v. Liberty Travel, Inc.*, No. 09–905, 2011 WL 1344745, at *8, 2011 U.S. Dist. LEXIS 38663, at *22 (D.N.J. Apr. 8, 2011). Nor do they claim that plaintiffs' interests are "antagonistic to the interest of other members of the class." *Cordes*, 502 F.3d at 99. They instead contend that the claims of the representatives will be subject to unique defenses—a claim that belongs under the typicality inquiry. *See* C. Wright et al., *supra*, § 1764; McLaughlin, *supra*, § 4:18; but *see Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990) (recognizing that the question has been raised under both requirements of Rule 23(a)).

Defendants point to Mr. Cruz and argue that he has previously obtained a settlement and released his claims. Mr. Cruz is not offered as a class representative. They also cite to termination notices of other plaintiffs without explaining what unique defenses the terminations would entail, and how they "threaten to become the focus of the litigation." *Gary Plastic*, 903 F.2d at 180. Although defendants' provided reasons for the terminations—falsifying time records—sound quite relevant to the claims asserted here, the submitted testimony reveals more narrow grounds: taking a long lunch break for one of the plaintiffs and, for the other, calling in sick while performing work on the side. These allegations, which continue to be disputed by the two plaintiffs, will have little to do with proving plaintiffs' claims as they will not undermine the time records which plaintiffs assert will establish underpayment and illegal deductions. *See Gortat v. Capala Bros.*, No. 07–CV–3629, 2010 WL 1423018, at *6, 2010 U.S. Dist. LEXIS 35451, at *21 (E.D.N.Y. Apr. 9, 2010) (disagreements not related to the matter in dispute are not relevant to the adequacy analysis); *see also Becher v. Long Island Lighting Co.*, 164 F.R.D. 144, 152 (E.D.N.Y.1996) (distinction between former and current employees does not create a conflict because "[a]ll participants seek the same 'make-whole' relief").

Whatever defenses may be introduced as a result of these terminations do not make the plaintiffs inadequate representatives or their claims atypical.

Next, defendants complain that the class representatives "have not participated in even the most minimal way in this action." In support, they cite to the testimony of several plaintiffs, who provide inaccurate descriptions of the class they seek to represent, admit to not reading or merely skimming the amended complaint, and state that they hope not to invest much more time into the case.

Again, this goes to typicality. *See Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*, 222 F.3d 52, 61 (2d Cir.2000) (noting that the "knowledge requirement" should be applied with "a view toward typicality concerns" as an ignorant representative may give "misleading or contradictory testimony that might make his claims subject to unique defenses"). Courts have demanded that representatives "not simply lend[ ] their names to a suit controlled entirely by the class attorney." C. Wright et al., *supra*, § 1776; *see also* McLaughlin, *supra*, § 4:29 ("Certification should be denied ... if the proposed class representative demonstrates such a lack of knowledge and understanding of the claims and theories raised in the case that he is or she is unable to make informed decisions and cannot meaningfully supervise class counsel."). Thus, where a plaintiff was unaware of the suit until reading about it in a newspaper, had limited or no communication with class counsel, could not recognize the complaint, and "believed the lawsuit made him look bad," he did not satisfy his burden of showing that he would be an adequate representative of the class. *Monroe v. City of Charlottesville*, 579 F.3d 380, 385 (4th Cir.2009); *see also Epifano v. Boardroom Business Products, Inc.*, 130 F.R.D. 295, 302 (S.D.N.Y.1990) (finding the proposed representative inadequate where he did not do "anything to become informed about the litigation").

As *Monroe* suggests, the bar for showing sufficient knowledge is quite low; "knowledge of all the intricacies of the litigation is not required and several courts have

found that general knowledge of what is involved is sufficient." C. Wright et al., *supra*, § 1776. Indeed, as the Second Circuit has recognized, the Supreme Court disapproves of "attacks on the adequacy of a class representative based on the representative's ignorance." *Baffa*, 222 F.3d at 61 (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370–74, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966)). A proposed representative meets this requirement where the record shows a willingness and ability to pursue the litigation on behalf of the class, and understanding of the subject of the litigation. *See id.* at 62.

I find that the class representatives have made this modest showing. Although I am concerned that one of the plaintiffs has not read the complaint, I am satisfied that all of the representatives understand the nature of the lawsuit and have all shown a willingness to pursue it as demonstrated by their cooperation in discovery. That they are not as familiar with the pleadings as they could be is outweighed by their basic understanding of the case. *See, e.g., Iglesias–Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 372 (S.D.N.Y.2007) (observing that while Rule 23 requires "adequate personal knowledge of the essential *facts* of the case," plaintiffs are entitled to rely on their counsel for the legal underpinnings of their claims) (emphasis in original). For instance, the plaintiff who did not read the complaint explained that he joined the lawsuit when he received information that other people had similar complaints about defendants; that he represents some of these individuals; that the gist of the claim is "minimum wage laws infractions" and hour-shaving that he knew to occur; that he had spoken to class counsel "many times;" and that he had already spent 20–40 hours on the case.

### 3. Numerosity

Plaintiffs submit that they easily meet this requirement for the individual subclasses as each state has more than the 40 putative class members that the Second Circuit has stated is presumptively sufficient for a class to be considered numerous. *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995). Plaintiffs explain that with the exception of Hawaii and California, they sent more than 60 notices of the FLSA action to each state pursuant to this Court's previous Order. To Hawaii and California they sent, respectively, 27 and 28 notices. Plaintiffs claim that the former subclass has more than 50 members, as suggested by the admitted turn-over rate between 31 % and 60% and a statute of limitations that is double the length of the FLSA time bar. *See* 2 Newberg *supra*, § 3:5 (4th ed. 2010) (good-faith estimate of the class size is sufficient). Plaintiffs request certification given the Court's likely adjudication of the FLSA claims and the practical difficulties that the Californians and Hawaiians would have in bringing individual suits. *See Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993) (noting that the requirement that joinder be impracticable is not the same as requiring that it be "impossible").

Defendants challenge this element in a footnote, suggesting that the argument "is nothing more than counsel's afterthought." *Wilson v. New York City Police Dep't*, No. 09–CV–2632, 2011 WL 1215031, at *11–12, 2011 U.S. Dist. LEXIS 38995, at *36 (S.D.N.Y. Feb. 4, 2011). They have determined that California and Hawaii could have no more than 31 and 33 plaintiffs, respectively. They do not explain, however, why joinder would not be impracticable. *See* 2 Newberg *supra*, § 3:5 ("Joinder of a smaller [than 40 member] class may be impracticable because of the circumstances of the particular case."). Given the certification of the class in 12 other states, the substantial number of potential class members in the two states, "the avoidance of a multiplicity of actions," the limited financial resources of the commissioned technicians, and their inability to institute individual suits, I find that plaintiffs have satisfied the numerosity requirement. *Robidoux*, 987 F.2d at 936.

### III. Damages and Trial Management

The discussion thus far has focused exclusively on liability. Plaintiffs have not established that damages can be proven with the efficiency that has permitted class treatment on liability. For instance, with respect to the business expense claim, plaintiffs ar-

gue that the actual expenses incurred by technicians are "entirely irrelevant." I have disagreed with that assessment, finding the inquiry into individual business expenses relevant but not predominant because it will be presented to the jury efficiently through aggregation. But if damages have to be proven, this efficiency is lost. Citing FLSA actions initiated by the Secretary of Labor, *see, e.g., Reich v. Southern New Eng. Telcoms. Corp.,* 121 F.3d 58, 66 (2d Cir.1997), plaintiffs suggest the use of representational evidence, *i.e.,* testimony by some members of the class to establish damages for the rest of the class. I am not convinced that it is appropriate in a class action, where, by plaintiffs' own admission, defendants have the records necessary to make individual determinations. The better course is to sever liability and damages, particularly because the parties have represented that they have not engaged in damages-related discovery. The Second Circuit in, *Nassau County,* 461 F.3d at 226–27, has permitted district courts to certify a class action with respect to liability only. I exercise my discretion to do so here, and will schedule further briefing on how to proceed with respect to damages. *See Visa Check,* 280 F.3d at 140 (listing the "management tools available to a district court to address any individualized damages issues that might arise in a class action").

To reiterate, although plaintiffs have met their burden on the facts presented to me that they meet Rule 23 requirements to establish liability, class certification is, of course, "inherently tentative." *Falcon,* 457 U.S. at 160, 102 S.Ct. 2364. Plaintiffs have proffered what essentially amounts to a "paper case." I recognize that some testimony will be necessary, not just to authenticate and interpret defendants' records, but to fill occasional gaps and provide relevant background. However, if plaintiffs begin to have second thoughts about their chances at trial without offering more testimony, I will decertify the class. *Cf. Espenscheid v. Direct-Sat USA, LLC,* 09–cv–625, 2011 WL 2009967, at *7 (W.D.Wis. May 23, 2011) (decertifying

an FLSA action on the eve of trial after reviewing plaintiffs' proposed trial plan). The parties are on notice that the Court will expect a detailed Joint Pretrial Order (JPTO); omissions will have preclusive effect at trial. They should also prepare for the usual scrutiny this Court applies to the JPTO at the Final Pretrial Conference.

## IV. Late Opt-ins

The opt-in period for the FLSA collective action closed. on November 19, 2010, with the late opt-in requests coming some five months late and nine months after the notices were first circulated.[11] Because defendants consent to allowing Molina and Villatoro to join the action, I allow them to file their forms and review only the requests from the other five potential plaintiffs. Plaintiffs purport to offer good cause with respect to the late filing of all five potential plaintiffs: Megeed did not receive the notice; Alvarado is not fluent in English and did not respond until someone translated the notice for him; Lopez and Bryner feared retaliation but are no longer employed by defendants; and Somerson also feared retaliation but has reconsidered his decision. They argue that not including these plaintiffs would result in duplicative lawsuits and that defendants would not suffer prejudice given the posture of the case.

As one Court recently explained, the FLSA does not provide when consent forms can be filed after court-imposed deadlines have passed. *See Ruggles v. Wellpoint, Inc.,* 687 F.Supp.2d 30, 37 (N.D.N.Y.2009). And the caselaw is "wide-ranging:"

> Courts have generally decided the question by balancing various combinations of the following factors: (1) whether good cause exists for the late submissions; (2) prejudice to the defendant; (3) how long after the deadline passed the consent forms were filed; (4) judicial economy; and (5) the remedial purposes of the FLSA.

*Id.*

Defendants first argue that the potential plaintiffs have not submitted affidavits sub-

---

11. Plaintiffs' attorney received some of the consent forms earlier, but was in discussions with defendants' counsel to obtain his consent before making the instant motion. One of the proposed

plaintiffs signed his form even earlier but requested that it not be filed while he was still working for defendants.

stantiating their excuses, which at least one court has required. *Ayers v. SGS Control Services, Inc.*, No. 03 Civ. 9078, 2007 WL 3171342, *4–5 (S.D.N.Y. Oct. 9, 2007). In *Ayers*, however, the Court had directed any late-filers to submit affidavits; I have not requested the same when I deemed the pre-motion letter to constitute plaintiffs' motion.

Second, defendants claim that they will be prejudiced because the 40 representative depositions they had taken to form the record in opposition of the motion for class certification did not include any of these late filers. They cite *Wren v. RGIS Inventory Specialists*, No. 06–5778 JCS, 2009 WL 1773133, *4 (N.D.Cal. June 19, 2009), where the Court permitted late filers to join the action but excluded those who submitted their forms after the motion to decertify the collective motion was due. I have not scheduled briefing on any motion to decertify, and given my ruling on the certification of the state claims, it may well be that no such motion is forthcoming. Moreover, with more than 400 opt-ins, I fail to see much, if any, prejudice to defendants; if the contention is that defendants would have picked one or more of these five putative named plaintiffs for the sample depositions, and that their testimony would have changed the landscape for the motion to certify a nationwide class, it is farfetched to say the least.

Nevertheless, I am concerned that plaintiffs' well-worn efficiency argument—the notion that late filers should be joined because a new action will have to be filed—is becoming the "*carte blanche* to file additional consent forms" that the *Ruggles* Court predicted would not happen in its action. Plaintiffs have made this argument before to extend the opt-in period by 60 days to allow 40 technicians to join—a request that I granted. To the extent *Ruggles* suggests that good cause is unnecessary to allow late opt-ins, I respectfully disagree; although a relaxation of the standard may be appropriate in light of the FLSA's remedial purpose, *see Wren*, 2009 WL 1773133, at *4, the logical extension of not requiring good cause at all would make a court-imposed deadline prior to a decertification motion meaningless.

I am also concerned that at least as counsel has described it, one of the plaintiffs provides no justification for his lateness, merely stating that he did not receive the notice without explaining how he eventually got wind of the suit. I am therefore directing the five potential plaintiffs to file detailed affidavits to substantiate (if possible) counsel's proffer, explaining the reasons for their lateness. If I am satisfied by the affidavits, I will allow the five plaintiffs to opt into the action. Defendants, however, will not be constrained with respect to these plaintiffs by the previous Order allowing only 40 depositions; all five of these individuals will be expected to fully participate in discovery.

### *CONCLUSION*

For the reasons provided above, plaintiffs' Motion to Certify the Class [159] is GRANTED in part. Liability and damages are severed, and the class is certified with respect to liability only. Plaintiffs shall file affidavits in support of their [199] Motion to include additional plaintiffs in the collective action by [10 days after POFs]. The two plaintiffs who defendants agree should join the action shall file their consent-to-sue notices forthwith. Michael J.D. Sweeney is appointed class counsel, plaintiffs' definition of the class is adopted with the exception of the modified claim for uncompensated hours, and is exhibited to this Order pursuant to Rule 23(c)(1)(B) of the Federal Rules of Civil Procedure. The Court will issue a scheduling order by separate entry.

**SO ORDERED.**

### *MEMORANDUM DECISION AND ORDER*

Before me is defendants' motion for partial reconsideration of the Court's Order certifying a nationwide class. Familiarity with that decision and the background of this litigation is presumed. The Court certified a class of service technicians on claims for (1) imposing business expenses on the technicians; (2) failing to compensate them for time shaved from their actual hours of work, time spent at turn-in and other meetings, and time spent maintaining their vans and work equipment; and (3) taking deductions from the

technicians' wages. In certifying the class, I recognized that individualized proof would be necessary to establish liability for the first two claims but concluded that given the efficiency with which that could be done—through records—the issues requiring generalized proof predominated over those that require individualized proof.

The instant motion concerns only the second claim, and only part of it; defendants argue that the Court overlooked plaintiffs' concession that establishing liability for time spent on maintenance of vans and tools is impossible without individual testimony. Plaintiffs disagree that the Court overlooked anything—the argument that this aspect of the uncompensated hours claim was unique for purposes of class certification, plaintiffs argue, was never made. They contend that even if the Court were to reconsider this point, class certification continues to be appropriate because it was the nationwide policy of requiring maintenance but not providing a way for it to be compensable that is the crux of the issue.

■■■ The standard for reconsideration is "strict" and must be based on data or authority the Court overlooked, *see Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995), rather than on "new facts, issues, or arguments not previously presented." *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos., Inc.,* 265 F.3d 97, 115 (2d Cir. 2001). Plaintiffs argue that the instant motion falls in the latter category. I disagree. Defendants' statement of facts in their opposition for class certification treated the relevant claim for uncompensated hours separately, citing deposition testimony from plaintiffs to indicate that some performed their maintenance work on the clock, while others did not. Their argument section did not make the same distinction, attempting to defeat class certification for the uncompensated hours claim in one fell swoop. But the argument that issues requiring individualized proof predominated was still made, even if it was not pressed as cleanly as it could have been with respect to each aspect of this claim. Thus, I will reconsider defendants' argument as it relates to tool and van maintenance.

■■■ Defendants' argue that the very nature of this claim—one that they now label the "Van and Equipment Time Claim"—requires a "parade" of witnesses called to testify that they performed these tasks off the clock. Defendants' Rule 30(b)(6) witness Gary Sander admitted, however, that maintenance work is included in the general duties of a commissioned technician's job and that prior to a new policy, if they performed this work outside of their branch office, there was no clear way for them to record the time. Without more, I would have rejected defendants' assertion that much testimony would be required—if a job includes tasks that, as a practical matter, cannot always be performed at the office and is not compensated otherwise, representational testimony and a defendant's Rule 30(b) (6) witness may be all that would have been needed. Indeed, Sander appeared to concede that defendants do not consider van maintenance time to be compensable and that that only "minor maintenance" could be done on vans during the compensable "stand-by time." [1]

But there is more. Sander also explained that the time spent on tool maintenance

---

1. "Q. If the technicians spent time maintaining their vans outside of their scheduled hours, should that time have been recorded on the timekeeping system?

A. Not necessarily.
Q. And why not?
A. It's his van.
Q. So, am I correct in saying that because Roto–Rooter considered the van the technician's van, the time the technician spent working on that van was not considered compensable time by Roto–Rooter?
A. Generally speaking, I would say no.
Q. Are there exceptions to that rule?

A. I could envision a technician, during their stand-by period when things are slow, doing some-or getting some minor maintenance done to his van....
Q. If the technician had to take that van to a body shop and get the body work done, would the time that the technician dedicated to bringing the van to the shop and the time he had to spend making sure the body work got done, would that time be considered compensable time by Roto–Rooter?
A. I wouldn't know, sir.
Q. You wouldn't consider it compensable time, is that right?
A. That's right."

would be registered as stand-by time by someone at the branch office. If done outside of the office, that time could still be recorded but someone at the office would have to input it, again coding it as stand-by time. And in practice, it appears that some technicians were able to perform both van and tool maintenance on stand-by time.[2] To be sure, the testimony suggests that not all of this work was compensated even for those technicians who admitted to regularly performing it on the clock.[3] But faced with evidence suggesting that some of the technicians may have been able to squeeze all of their maintenance time on stand-by time, plaintiffs have not provided testimony to the contrary, making this issue not just about damages, but about liability. Technicians would therefore have to testify at trial either during plaintiffs' case-in-chief to show that as a matter of practice, not all maintenance could be performed on stand-by time or by defendants would have to offer testimony to show that it could. *See* 1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 5:23 (6th ed. 2010) (the predominance inquiry should take into consideration affirmative defenses).

Thus, plaintiffs' contention that the legality of the "policy of assigning maintenance tasks and not treating them as work time" is a question that can be determined for the class "without the need of individual testimony or work records" is without merit. Plaintiffs have not pointed to an affirmative policy by defendants of not compensating for this work; quite the contrary, Sander acknowledges that maintenance tasks have been compensated through stand-by time. The

question is again about practice, and how the policy of not providing an easy way to receive compensation for time spent on maintaining technicians' vans and tools leads to the practice of not compensating for this work. As defendants have shown, that effect is different on individual technicians, requiring even the question of liability to be resolved through a highly individualized inquiry. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42–43 (2d Cir.2006) (inquiry into the merits of the case is appropriate when there is an overlap with a Rule 23 requirement).

The prospect of substantial individual testimony tips the scale for the predominance inquiry against class certification. As the Court observed in the previous Order, and is as apparent in this discussion, there are many commonalities that unite the class with respect to this claim, including the type of commonalities that can "generate common answers" through classwide resolution. *Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 132 (2009)). These common elements outnumber the individualized question. But the predominance inquiry is not mechanical, *see* 2 Alba Conte, William B. Rubenstein & Herbert Newberg, *Newberg on Class Actions* § 4:25 (4th ed. 2011) ("the predominance requirement is not a numerical test that identifies every issue in the suit as suitable for either common or individual treatment and determines whether common questions predominate by examining the resulting balance on the scale"); it is "pragmat-

---

**2.** Christian Cruz testimony:
 "Q: Are you on stand-by time when you maintain your truck? A: Yes, ma'am."
 Leka Drej aj:
 A: I clean the machine and the van, I waste a lot of WD–40s on those things.
 Q: And this is during stand-by time?
 A: Yes, ma'am....
 Q: Do you ever maintain your tools during stand-by time?
 A: Yes, ma'am....
 David Lawson:
 A: ... You know, clean my van or whatever, you know. Even if I have an oil change or wash it, I'm still on stand-by.
 Q: So you take care of all of that while you are on stand-by time, correct?

 A: Right....
 A: Any kind of work I do on my maintenance for my machines or anything like that is on stand-by time.

**3.** Antoine Rosime:
 "A: Sometimes. Some tech do it. Sometimes I did. Q: You did that sometimes? A: Yes."
 Steven Hess:
 "Q: Are you ever on the clock when you are cleaning your van? A couple of times, I have been on the clock."
 Levoid Bradley:
 "A: If I had time to do it. If I felt I was going to be on stand-by that long, yeah, I would."

ic." C. Wright, A. Miller & E. Cooper, 17A *Federal Practice and Procedure* 3d § 1778 (2011). And as a practical matter, establishing liability for uncompensated hours for maintenance work would require separate adjudication of each plaintiff to ascertain whether he was able to perform that work on stand-by time.

For the foregoing reasons, defendants' Motion for Reconsideration [207] is GRANTED. The definition of the class is amended to exclude a claim for uncompensated hours for maintaining plaintiffs' vans and work equipment.

**SO ORDERED.**

Dated: July 8, 2011.